IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARHC CHSGDIL01, LLC,<br>ARHC CHPTNIL01, LLC,<br>ARHC HHPEOIL01, LLC,<br>ARHC MTMTNIL01, LLC,<br>ARHC MVMTNIL01, LLC, and<br>ARHC RHMARIL01, LLC, each a Delaware<br>limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>MANAGCARE, INC., an Illinois corporation;<br>CAPITOL HEALTHCARE AND<br>REHABILITATION CENTRE LLC, an<br>Illinois limited liability company;<br>COLONIAL HEALTHCARE AND<br>REHABILITATION CENTRE LLC, an<br>Illinois limited liability company; THE<br>HEIGHTS HEALTHCARE AND<br>REHABILITATION CENTRE LLC, an<br>Illinois limited liability company; MORTON<br>TERRACE HEALTHCARE AND<br>REHABILITATION CENTRE LLC, an<br>Illinois limited liability company; MORTON<br>VILLA HEALTHCARE AND<br>REHABILITATION CENTRE LLC, an<br>Illinois limited liability company; and<br>RIVERSHORES HEALTHCARE AND<br>REHABILITATION CENTRE LLC, an<br>Illinois limited liability company,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. 1:16-cv-09245**<br><br><br>Honorable Edmond E. Chang |

## RECEIVER'S INITIAL REPORT

Suzanne A. Koenig, not individually, but solely in her capacity as Receiver pursuant to

the Consensual Order Appointing Receiver dated November 1, 2016 ("Receiver Order")[1] [Dkt.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Receiver Order.

No. 28], hereby submits her first report summarizing the activities performed by the Receiver, and states as follows:

**A.      Facilities Overview**

I.      Capitol Healthcare and Rehabilitation Centre LLC, 555 West Carpenter Road, Springfield, Illinois 62702 ("Capitol Healthcare")

a. *Overview*

Capitol Healthcare, also known as Mosaic of Springfield, has 251 dually licensed Medicare/Medicaid beds and 195 beds are available. Based on information given to the Receiver, 56 beds have been taken out of use as a means to attract more residents, thereby hopefully increasing census levels by changing the room configurations to single occupancy.

The four story brick building shows age and does not have positive curb appeal. The front entrance is accessible by stairs or walking ramp and does not accommodate a visitor drop off area. The parking area is located to the right of the facility and has limited parking spaces for visitors. The ambulance transport entrance is located on the side of the building and does not present an appealing first impression when a resident enters the facility.

The front entrance is always locked; however, security staff are available 24/7 for visitor entry. The admissions office is located immediately to the right of the entrance and is tastefully decorated. As one enters through the front entrance, there is a large open area that shares a dining room and sitting area; however, during meal service the area always appears crowded. A spacious therapy area is located to the left of the entrance. Two elevators are located near the rear of the facility to access the four levels of resident rooms. Most of the resident rooms and hallways generally lack routine maintenance; as an example, there are no doors in many of the bathrooms and closets in the resident's rooms, and furnishings are old and in disrepair.

The first floor is partially below elevation, or underground, and contains 28 resident rooms. The exit door on this floor exits into the designated "smoking area." The main floor, which is the second floor, contains 34 rooms and looks much like the first floor. This area is designated for long-term residents. The third floor is the most recently renovated area in the facility and contains 33 private rooms. This floor is certified for Medicare residents and is designated the "Short-Term Stay Area." The fourth floor, designated for residents who have dementia, has 29 rooms.

### b. Staff

All department manager positions are filled at this time. The nursing department is stable, as there have only been a few shifts of registry staff utilized since November 1, 2016. An active recruitment process for employees is in place due to the constant turnover in the Certified Nursing Assistant positions. The staffing levels appear appropriate, in accordance with both the resident census levels and the capacity to provide quality, patient-centered care. Housekeeping and laundry services are provided through a contract with Healthcare Services Group.

The Receiver is in discussion with the Coordinator of Collective Bargaining and Representation for Nursing Homes (SEIU Health Care IL/IN/KS/MO) to arrange a future meeting after, likely after March 1st, to discuss Union arrangements, as the current contract negotiations had been extended prior to the appointment of the Receiver.

### c. Clinical Care

After initial assessment by Central Illinois Management Services, LLC ("CIMS"), it appears the nursing staff is in need of education to improve quality measures, which are indications of the level of care provided by the facility (*See* CMS.Gov, Department of Health and Human Services and the Centers for Medicare & Medicaid Services Initiatives to assure quality health care). Quality measures are used by hospitals and insurance companies to evaluate the

care provided by the facility to the residents. CIMS will be working closely with the facility administration to set up programs to identify problems, develop solution interventions and to monitor the care and services. A Registered Nurse consultant will visit the facility weekly to work with the nursing leadership and to redesign the nursing responsibilities.

### d. Marketing

The facility struggles with a negative community reputation due to past regulatory and staffing concerns. The prior lessee set up a D/B/A (The Mosaic of Springfield) to try and ameliorate the negative facility image with a positive name change; however, the facility is still known in the public by its original name, Capitol Healthcare and Rehab Centre, LLC.

The poor condition of the interior of the building and its outdated furnishings make it a real challenge to sell or market the facility and its services. The CIMS team has ramped up the marketing program, and the regional marketing director is working closely with the administrator to hold him accountable to increase census levels. CIMS visits frequently and conducts a weekly conference call with the administrator and the Marketing/Admissions director to discuss admissions and marketing strategies.

Weekly and monthly reporting tools have been implemented to track all referrals, tours, admissions and discharges. The information gleaned from these reports is discussed during the weekly meetings. The newly-developed marketing program is designed to improve the community reputation and increase referrals. A major focus will be placed on The Joint Commission's Gold Seal of Approval, as this rating can hopefully help offset the image of the facility's one-star rating. Internal marketing is just as important as external marketing, and a facility team has been organized to support the Marketing Director's external leads. The focus of the team will be to improve employee morale and patient/family satisfaction.

A plan is in place to quickly review each referral and have an admission response back to the referral source within 15 to 30 minutes. No admission can be denied without the approval of the new management team. No admission will be accepted that will compromise resident care and safety; however, solutions will be identified and implemented to support the admission of the referral wherever possible.

e. *Capital Investments*

i. Elevators

The elevators are outdated, and the administrator reports frequent problems with their operation. The elevator permits expired December 1, 2016 and new permits issued by the State of Illinois cannot be attained until major repairs, and renovations have been completed. This has been an ongoing problem. The vendor, KONE elevator, reports they had discussed the problem and renovation with the prior lessee. According to information received from KONE, a $90,000 payment was submitted to start the work by the prior lessee. The contract was signed by the Licensed Administrator on 8/1/16. The Receiver reviewed the contract and is resubmitting it to KONE with some minor language changes. The Receiver followed the necessary procedure to review and approve contracts over the $10,000 limit. Each elevator will take up to 8 weeks for full upgrade and work will begin in February. The balance remaining owed on the contract is $207,683.00, and KONE will expect "progress pay" in the amount of $51,921 per each month beginning with February through May, when the project will be completed.

ii. Masonry leak

The exterior of the facility has several areas with crumbling mortar between the bricks. The licensed administrator reported that the mortar damage occurred prior to the Receivership during an exterior power washing of the building. The lack of mortar allows rainwater to penetrate the interior and has resulted in drywall damage. There is concern for possible mold

growth and the Illinois Department of Public Health ("IDPH") has responded to complaints of mold. Three bids have been obtained from local vendors to repair and replace the mortar in the range of $22,000 to $29,500. The cold weather will not be conducive to the cure of the cement so the project will wait until spring.

### iii. Firewall and Smoke Barriers

The fire and smoke barrier walls terminate before touching the deck floor above the ceiling. Life Safety Inspectors from IDPH mandated that fire smoke barrier walls be extended to touch the deck floor between the floors. An extension to 5/14/17 has been granted by IDPH, as approved by Bill Meyers, the Regional Director for Life Safety. The Receiver engaged a regulatory attorney and an architect who have provided correspondence to IDPH to refute the specifications of the smoke barriers in relationship to an already existing building. The facility is awaiting a response. Three bids have been obtained for this week, which is dependent on the IDPH response as to the scope of the work needed. The bids range from $62,000 to $387,000.

### f. Census Evaluation

- 11/1 Beginning census          = 147
- 11/30 Ending census   = 141                          (-6)
- 11/30 1 resident in hospital anticipated to return
- 11/30- Resident days = 4391
- 12/1 Beginning census= 142
- 12/31 Ending Census =141
- 12/31 1 resident in hospital anticipated to return
- 12/31- Resident days = 4403                (+12 days more than Nov)

II.    Colonial Healthcare and Rehabilitation Centre LLC, 515 Bureau Valley Parkway, Princeton, Illinois 61356 ("Colonial Healthcare")

### a. Overview

Colonial Healthcare is dually licensed and certified for 92 Medicare and Medicaid beds. The facility is a single-level structure. The advanced age of the building, its outside structure and

negative curb appeal have contributed to the challenges in selling and marketing the facility and its services.

The main entrance, which is in the front of the building, is not used frequently due to the excessive walking distance from the visitor parking area. The facility has compensated for this by constructing a canopy-covered entrance on the side of the facility near the parking area. A small reception area has been created near this entrance to welcome visitors. The entrance and furniture is tastefully arranged to create a friendly and welcoming environment when entering the building.

The administrator's office is located to the left of the front entrance, while a small lounge is located to the right. The room has been renovated to provide a warm and cozy setting for family members to meet with residents. A small dining area is located near the front entrance and is used by the alert and ambulatory residents residing in the Medicare hall. The less ambulatory and alert residents take their meals in a larger dining room near the rear of the facility. The therapy area is small compared to those in the other facilities in the portfolio.

A routine maintenance program is in place and the overall condition of the facility is acceptable. The decorations and furnishings could use an update. The kitchen has organizational issues that need attention, including problems serving the proper diets and getting food out on schedule. The CIMS team's Director of Quality Improvement and the Director of Operations will work closely with the administrator and dietary manager to improve this area. The residents have recently reported satisfaction with the food choices and meal service.

      *b. Staff*

All the department manager positions are filled at this time. The facility has a stable, licensed staff in place with little turnover. The staffing levels appear appropriate to provide

quality, patient-centered care at the current census. Housekeeping and laundry services are provided through a contract with Healthcare Services Group.

### c. Clinical Care

The facility has enjoyed a five-star rating through October 2016. However, prior to the Receivership, there was a survey conducted by the IDPH that cited one deficiency, which dropped the facility's rating to 4 stars going forward. The resident care provided by staff looks very good. The administrator reports that the local physicians have a high confidence level with the nurses in follow-through on their orders.

The facility needs to possibly step out of their comfort zone and begin to admit more clinically complex residents. There are very few Medicare residents, and census has plateaued because the potential pool of residents from the hospitals is more clinically complex, needing more intense skilled care on admission. Generally, this facility will not admit a skilled resident needing more care. A Registered Nurse consultant from CIMS will visit the facility weekly to work with the nursing leadership and identify education needs.

### d. Marketing

The facility has a four-star rating with the Centers for Medicare and Medicaid Services ("CMS") and an excellent reputation in the community (CMS.Gov - Nursing homes with 4 stars are considered to provide above average quality and nursing care). The facility has a high private pay census, but a low Medicare census. The facility's physical structure and amenities cannot compete with newer facilities in the area. The previous lessee budgeted only 24 hours for the marketing position; this has been increased to 40 hours per week post Receivership. The marketing office is small and not conducive to meeting with families. Prior to the Receivership, the facility had placed little emphasis on increasing the census; an increased focus on census has

now been mandated. The administrator stated that most residents needing short-term rehab wanted a private room, and she had been instructed to turn some of the semi-private rooms into private rooms by the previous lessee.

The CIMS management team has ramped up the marketing program and the Regional Marketing Director is holding the administrator and other responsible managers accountable for increasing the census. A new marketing plan has been implemented. The program will focus on the facility's four-star rating and the longevity of the staff that care for the residents. The goal for this facility is to increase the short-term rehabilitation census. New weekly and monthly reporting tools have been implemented to track all referrals, tours, admissions and discharges. The information gleaned from these reports is discussed during the weekly meetings with CIMS staff.

An internal marketing team has been organized and tasks have been assigned in order to support the Marketing Director's external leads. The focus of the team will be to improve employee morale and patient/family satisfaction. A plan is in place to quickly review each referral and to have an admission decision back to the referral source within 15 to 30 minutes. No admission can be denied without the approval of the new management team. No admission will be made that will compromise resident care and safety; however, solutions will be identified and implemented to support the admission of the referral wherever possible.

    e. *Census Evaluation*

- 11/1 Beginning census     = 70
- 11/30 Ending census   = 67                 (-3)
- 11/30- No residents in hospital anticipated to return
- 11/30- Resident days = 2065
- 12/1 Beginning census    =67
- 12/31 Ending census   =71                (+4)
- 12/31 No residents in hospital anticipated to return

- 12/31- Resident days = 2162          (+97 compared to Nov)

III.      The Heights Healthcare and Rehabilitation Centre LLC, 1629 Gardner Lane, Peoria Heights, Illinois 61614 ("Heights Healthcare")

     *a. Overview*

Heights Healthcare is licensed for 110 unrestricted beds and 98 beds are available for use. In the past, resident rooms had been converted to a therapy gym and to office space. The facility is a one-story building. The roof is constructed of metal and is in good condition. The therapy gym is spacious, with large windows, and has an occupational kitchen. There is both an internal and external entrance to the therapy gym. Employees familiar with the past management stated that the original plan was to provide outpatient therapy to the community; however, the permits were never obtained. There is no water source for the gym and there are no separate bathrooms from those in the facility. The Receiver and the management team reviewed the requirements for outpatient therapy and the cost for meeting the current life-safety standards and at this time determined such a program to be too costly to pursue based on current revenues. The renovation would require constructing bathrooms and installing a water supply for that distinct area.

The exterior of the building and the grounds provide positive curb appeal. Management discovered there were elevated radon gas levels surrounding the facility and, sometime in the past, radon pumps were installed to provide negative pressure under the floor of the building and prevent the gas from rising into the facility. Radon gas is produced from a natural breakdown of uranium in soil, rock and water. The purpose of the pumps is to vent any radon gas that rises up from the soil to the outside of the facility. The vendor providing the pumps validates proper operation twice a year.

The main outside entrance leads into a large dining/activity area that is warm and inviting. The facility furnishings are dated but in fair condition, and the facility shows well to the

public. The reception desk is staffed from 8am until 8pm, and the Administrator's office is located near the front of the facility. Routine maintenance is adequate throughout the facility; however, touch up painting is needed on a consistent basis. The facility is clean and orderly but the entire kitchen needs more attention, from routine maintenance to sanitation cleanup.

### b. Staff

The Administrator of the facility served as a consultant for the prior management company, and tends to focus on global issues rather than the fine details required for one building. The Restorative Nurse, whose job is to decrease resident decline in function and increase the facilities' case index scores, has resigned. The MDS Nurse is new to her position and appears to be doing well. The facility has a history of high staff turnover in the nursing department, and they currently have several open positions for licensed staff and nursing assistants.

There are approximately 65 open nursing shifts for the month of January. The goal is to use staff employees and not outside agency staff; however, filling the open nursing shifts with in-house registry staff will require both new hires and overtime from current staff. The established procedure to cover these shifts is for the Director of Nursing to post the open shifts on the schedule, which allows current staff the opportunity to cover the open shifts. However, few nurses have signed up to fill the shifts. The CIMS team is helping the facility to implement an aggressive recruitment program via online job boards and local newspaper ads. The facility has been able to hire some new nurses who are still in staff orientation. The administrator has implemented a shift bonus program in order to attract current staff to cover the open positions until new staff are on board. An ongoing aggressive recruiting program is now in place and applications are received daily from online recruitment.

### c. Clinical Services

The CIMS team is in the facility several days each week, and works closely with the nurses to keep the facility in compliance with state and federal requirements. They have implemented Performance Improvement Programs ("PIPs") for all identified compliance areas (reference: https://www.ahcancal.org/quality_improvement/QAPI/Pages/PIPs.aspx). The facility conducts PIPs to examine and improve care or services in areas that the facility identifies as needing attention. Overall, the residents are well groomed and, in interviews, report they are pleased with their care. The facility has several new nurses and the staff turnover is high; an ongoing, aggressive teaching and training program is necessary. The training program follows Quality Assurance and Performance Improvement ("QAPI") guidelines. QAPI is the coordinated application of two mutually-reinforcing aspects of a quality management system: Quality Assurance (QA) and Performance Improvement (PI) (reference: CMS.gov). QAPI takes a systematic, comprehensive, and data-driven approach to maintaining and improving safety and quality in nursing homes, while involving all nursing home caregivers in practical and creative problem solving. The facility will require much oversight and training in order to comply with CMS requirements.

### d. Marketing

The short-term rehabilitation program is a positive feature of the facility. The Medicare wing is located in the front of the facility and adjacent to the therapy room, which is a positive selling point. The facility offers Telemedicine, which has been embraced by the medical community as a support and resource for the attending physician (reference: http://www.amdtelemedicine.com/telemedicine-resources/telemedicine-defined.htm).

Telemedicine allows health professionals to evaluate, diagnose and treat patients using

telecommunication technology. The Facility has obtained The Joint Commission's Gold Seal of Approval, and their 3 star rating should help drive increased census.

The regional marketing director who reports to the CIMS team visits and assists the facility each week while providing guidance to increase their admissions and satisfaction scores. The facility participates in a weekly marketing conference call designed to promote accountability and implementation of the newly created marketing plan. The marketing plan is individualized for each facility, and The Heights' focus is to increase their short-term rehabilitation program. The facility has a 3 Star rating with CMS and they have been accepted into several health plans. The goal of their marketing program is to increase the census numbers and change the payor source to short term Medicare and private insurance stays.

e. *Capital Investments*

On 1/8/17 one sprinkler head malfunctioned discharging water onto ¼ of the cooking area over the kitchen stove, steam table, and convection oven. There was no fire or smoke; the sprinkler head simply malfunctioned. As a result of the malfunction, three separate inspections occurred [County Health Department, Fire Department, and the Illinois Department of Public Health]. CIMS was onsite during the inspections and no citations were obtained. Food preparation was moved to an alternate location in the facility while the kitchen was thoroughly cleaned and sanitized. There was no food service interruption, resident diets were maintained, and most importantly no deficiencies were cited during any of the surveys. The kitchen was re-opened for service in the morning of 1/9/17. Late in the evening of 1/10/17, gas fumes were noted in the kitchen and the gas company was called. The gas company reported to the facility and shut off the stove due to gas leakage. The facility administrator was told the stove could no longer be used because of its condition. Staff had cleaned the top range following the sprinkler incident and there were likely existing pin holes in the pipes leading up to the burners; after

13

removing the buildup of debris and grease, the pin holes opened allowing gas to escape into the kitchen. Plans to either repair or replace the existing stove were discussed. The existing stove had several other problems: the old oven did not work, doors would not stay up and many burners did not ignite. Due to the age and overall condition of the stove, a new one was purchased for $1,250.

      *f. Census Evaluation*

- 11/1 Beginning census       = 86
- 11/30 Ending census   = 81                            (-4)
- 11/30 4 residents in hospital anticipated to return
- 11/30 Resident days = 2475
- 12/1 Beginning census      = 81
- 12/31 Ending census   = 86                         (+5)
- 12/31 2 residents in hospital and 1 resident on home visit anticipated to return
- 12/31 Resident days = 2589        (+114 days compared to Nov)

IV.     Morton Terrace Healthcare and Rehabilitation Centre LLC, 191 East Queenwood Road, Morton, Illinois 61550 ("Morton Terrace")

      *a. Overview*

Morton Terrace is licensed for 46 skilled beds and 120 intermediate beds, for a total of 166 unrestricted beds. Currently, there are 131 beds available for use. Over the years, rooms have been converted into a therapy gym, the dialysis unit, patient lounges and office space. The facility is a one-story brick building and is in fair condition.

The curb appeal is good and well-suited for selling healthcare services; there is ample parking available in front of the facility for visitors. Upon entry into the facility visitors enter a small reception area, which is staffed from 8am until 8pm. The entry door is secured via a key-coded alarm pad to prevent confused residents from exiting the facility without notice. The dining room/activity center is located near the front entrance and has some esthetic issues; upon

entry, the first impression is not pleasing to the eye as the room is massive, with minimal furnishings. The tables and chairs are in poor condition. The area is usually crowded, with many residents congregating in one area to watch the television. Simply rearranging the furniture will give a better first impression to those entering the building.

The facility faces many routine maintenance issues; however, most are not major repairs. The maintenance director spends an inordinate amount of time addressing emergency repairs, which may reflect a lack in his organizational skills. The maintenance director requires direction, and the CIMS team is assisting him to prioritize a list of items that must be accomplished on a weekly basis. The CIMS team is working with both the licensed administrator and the maintenance director to efficiently fix the areas that are in disrepair.

The Medicare hall and the Therapy Gym are positive assets to the facility. Most of the rooms in the facility are set up as semi-private, shared rooms; a plan is in place to turn some other rooms into private occupancy in the future in order to attract more short-term rehab admissions. The Dialysis Unit is located within the Medicare are and is another positive asset to the facility. The Dementia Unit is an area that does not show well to the outside consumer because of its outdated furnishings and deferred maintenance items. However, there were no safety concerns identified at this time. The unit has few resident outbursts due to a well-organized activity program.

The kitchen operation and organization is poor due to a lack in leadership over a long period in this department. A new Dietary Manager was hired a few months ago and was given minimal administrative support and no training. The apparent lack of leadership in the kitchen has exacerbated many problems, which CIMS has identified. Issues include poor sanitation and a lack of cleanliness, food quality issues and inaccuracies in preparation of resident diets. The

CIMS team has put an emergency plan in place to address these concerns; the plan includes meeting with the contracted dietary consultant to review the current concerns, an education and training program for the Dietary Manager and an action plan for the Administrator.

       *b. Staff*

The facility has had numerous administrative staffing concerns since the institution of the Receivership. Most of the key leadership staff positions have been newly hired and the administrative group had not formed a cohesive management team. The Administrator, Director of Nursing, Assistant Director of Nursing, Business Office Manager, Human Resource Manager, Marketing Director and the Activity Director have all been at the facility for less than 90 days. Many of these new administrative leaders had already resigned before the appointment of the Receiver and CIMS' arrival. A new Director of Nursing, Business Office Manager, Human Resource Manager and Activity Director have been hired since the appointment of the Receiver and will be starting their positions soon. The Administrator was given an action plan and a CIMS consultant is in the facility on a daily basis to provide support. The Administrator has many positive qualities; however, she is overwhelmed by the many daily operational problems, and her team is not yet effective enough to assist her in managing the facility. Due to the size of the facility, the specialty units and the many problem areas, an assistant administrator will be assigned to the facility in the near future.

The nursing staff is stable at this time and there are no agency personnel in use for licensed nurses and nursing assistants.

The Receiver has contacted Marc Parker, United Food and Commercial Workers, (UFCW), Local 536, and agreed to continue to leave the collective bargaining agreement covering Morton Terrace, Morton Villa and The Heights on extension under the same terms as applied under the agreement with the nursing homes. There have been two union grievances filed

at the facility since the appointment of the Receiver, and a member of the CIMS team has participated in the discussions and has helped bring a positive resolution to both grievances.

### c. Clinical Care

The facility has had numerous regulatory issues in the past; however, no major clinical concerns have been identified at present. The prior Director of Nursing had little experience in the long-term care arena and could not provide the leadership required for a large nursing unit. The new Director of Nursing has years of experience and came with positive references. Her first day on the job was December 21, 2016. A CIMS nurse consultant is in the facility weekly to identify concerns and implement interventions to ensure compliance. The Administrator, who is also a nurse, has implemented administrative nurse accountability for each specialty nursing area, and this appears to be working well. However, the nursing department responsibilities are fragmented as there is no one overseeing the department as a whole. The restorative nursing and psychotropic programs are not as effective as they should be, and this will be a priority in the new Director of Nursing's training and orientation.

### d. Marketing

Morton Terrace is a one-star facility due to the past regulatory and staffing history concerns. Institution of quality measures and improvement in staffing hours can help to improve the facilities' star rating, but it will take months of positive interventions to effect this change. The marketing office is located near the front of the facility and is decorated tastefully. The Marketing Director is new to the facility, but she has a strong marketing background and is keen to get the census moving.

The marketing program at Morton Terrace had been lacking for several months; still, the facility continues to get referrals and admissions. CIMS has implemented a strong marketing program. The Administrator and the Admission/Marketing Director are held accountable to

follow the new and improved marketing plan. The CIMS Regional Marketing Director is in the facility weekly to provide training on customer service. An internal marketing program has been implemented and the administrative staff was educated last week on how to conduct a tour and how to focus on the positive aspects of the facility. The nursing staff is also involved in marketing, and they are supportive of change. New marketing materials are being developed to focus on short-term rehab and the internal dialysis unit.

     *e. Capital Investments*

       i. Washing Machine Repair

Repairs have been made at a cost of $2,257.15; the machine is working with no further concerns.

       ii. Sprinkler and compressor

Midwest Renovation and Restoration provided necessary oversight to temporarily patch sprinkler system pipes in the attic. The air compressor that supports the sprinkler system is in poor repair and could go down at any time, due to several holes in the pipes which must be replaced. The system has several air leaks and eventually will need to be repaired by cutting out and replacing the bad pipes; this is what works the compressor so hard to the point of overload. The system is dry and must remain pressurized by the air compressor; if the air compressor fails and the pressure drops, this allows the system to become flooded with water. With the cold winter temperatures, flooded lines will likely freeze and break, resulting in flooding from the ceiling.

The sprinkler company refused to come out to fix the holes due to past-due invoices prior to the Receivership. A new compressor was purchased for $429.00. The sprinkler company has agreed to bleed the system and connect the new compressor for $1,150.00. This will temporarily prevent the flooding described in the last paragraph, but the new compressor will also be

overworked until the holes in the pipes are repaired. Approximate current cost $1,579, but this remains an ongoing issue.

      *f. Census Evaluation*

- 11/1 Beginning census      = 95
- 11/30 Ending census   = 94             (-1)
- 11/30 2 residents in hospital anticipated to return
- 11/30- Resident days = 2834
- 12/1 Beginning census      = 94
- 12/31 Ending Census = 95            (+1)
- 12/31 2 residents in hospital anticipated to return
- 12/31- Resident days = 2960     (+126 days more than Nov)

V.    Morton Villa Healthcare and Rehabilitation Centre LLC, 190 East Queenwood <u>Road, Morton, Illinois 61550 ("Morton Villa")</u>

      *a. Overview*

Morton Villa is licensed for 106 unrestricted beds and 105 beds are available for use. The facility is a one-story building and is in fair condition. The roof is in poor condition, and has had several independent repairs completed by different contractors at different times over the past few years. There are still some areas that continue to leak water during heavy rains or snowstorms. The landscape in front of the facility is expertly maintained and curb appeal is a positive feature of the facility, which looks nice upon first impression. Upon entry into the facility, there is a small reception area that is staffed with a receptionist from 8am until 8pm. The facility is clean and has an excellent routine maintenance program in place. The furnishings in the small sitting area located near the entrance are clean and in good condition.

The spacious therapy room located near the front of the building is a positive feature of the facility. The hallway where Medicare certified residents live is located near the therapy department and is accessible without going through other areas of the facility. A private dining room is located across from the therapy gym. The Medicare rooms are currently set up as semi-

19

private, shared rooms. CIMS' marketing plan indicates that these rooms be remodeled as Medicare Suites to accommodate short-term therapy residents. The main dining room for residents is spacious and is a gathering location for activities and socialization.

### b. Staff

All management positions are currently filled and the management team works very well together. There are Certified Nursing Assistant positions open. Open shifts are filled through part-time staff and overtime. Staff recruitment has been challenging due to competition from other healthcare facilities and general businesses in this small community. An aggressive recruitment program was implemented to fill the nursing assistant positions. The licensed nursing department is stable with no agency staff utilized since November 1, 2016. The staffing levels are appropriate for the census and adequate to provide quality, patient-centered care. The Human Resource Director and the Dietary Manager are offering assistance to their sister facility, Morton Terrace, until they fill their key positions.

### c. Clinical Care

The facility provides good nursing care and had no citations for substandard care during the last annual state health department survey. The facility is currently in their window for their annual survey, and the CIMS nurse consultant has recently identified concerns with documentation patterns. An education program has been implemented for improvement and a monitoring system is in place to review the documentation on a daily basis.

### d. Marketing

Despite the age of the building, the curbside appearance for this facility is positive and does not appear to be an obstacle to increasing the census. This facility has had regulatory issues in the past and holds a one-star rating from CMS. This rating does not affect community referrals as much as it affects managed care insurance companies' referrals. The CIMS team is working

closely with nursing administration staff to improve their quality measures, which will eventually improve the star rating. This facility is located directly across the street from a sister facility, but both facilities appear to attract different population groups and both continue to receive referrals from the local hospitals. The goal for the facility is to increase the number of residents admitted requiring short-term rehab.

The marketing office located near the front of the facility needs to be remodeled and updated to be more inviting to prospective residents. New marketing materials are being developed for the health professional community. The facility does not properly utilize bed management techniques, and the CIMS team is assisting the administrator to convert some of the semi-private shared rooms on the Medicare hall into private Medicare Suites. The private dining room on the Medicare hall is currently being utilized as a restorative work room, and arrangements are in place to turn this into a private dining and sitting area for short-term residents. An internal marketing team is now in place to support the external marketing plan, and the administrator is taking an active role in increasing the census.

*e. Capital Investments*

*i. Roof*

Major repairs are needed to repair the entire roof and seams due to excessive water leaks. A section of the roof was repaired in June or July of 2016, prior to the Receivership, due to the urgent nature of the water leaks. However, there are still multiple areas of concern. The initial bid submitted by AFE Construction LLC in June 2016 was for $80,670.10. The section of the roof repaired in the summer was repaired for $15,000; $10,000 had been paid with a balance of $5,000 remaining owed. With the advent of the winter months, further work will likely be postponed until spring.

### f. Census Evaluation

- 11/1 Beginning census      = 81
- 11/30 Ending census   = 82
- 11/30 1 resident in hospital anticipated to return
- 11/30 = Resident days = 2404
- 12/1 Beginning census      = 81
- 12/31 Ending census  = 77
- 12/31 4 residents in hospital anticipated to return and 2 residents on home visit
- 12/31- Resident Days = 2455          (+51 more days than Nov)

## VI. Rivershores Healthcare and Rehabilitation Centre LLC, 578 West Commercial Street, Marseilles, Illinois 61341 ("Rivershores")

### a. Overview

Rivershores is licensed for 103 unrestricted beds and 93 beds are available for use. Over the past few years, several of the rooms have been converted into a therapy gym, the dialysis center and office space. The facility structure, the age of the building and the poor curbside appearance have presented challenges for the facility to successfully market its healthcare services to the public. The facility has a reputation in the community for providing substandard care, and has a one-star rating from CMS. As with the other facilities in the portfolio, this facility's decorations and furnishings are worn and outdated. The dining area opens directly in front of the entry door, which gives little formal warmth and does not present a welcoming first impression upon entering the facility.

The admissions office is located near the front entrance and provides a comfortable location for meeting with prospective clients upon a new inquiry visit. The therapy gym is a positive feature of the facility; it is spacious and bright, and the many windows provide a welcoming and motivating environment. Unfortunately, Medicare residents are not always placed on the hall with the therapy gym; this hall is the most recently renovated area and, upon

first impression, is the hall that needs to be used to attract new Medicare admissions. The administrator has been instructed to relocate Medicare and insurance residents to this hall. Additionally, some of the rooms on this hall can easily be remodeled into private suites, which will be more attractive to new short-term admissions needing therapy. The licensed bed number need not be changed.

The facility's routine maintenance program is lacking; there are a lot of deferred maintenance areas that need to be addressed. As a result, the facility is not as inviting as it might be and first impressions are not always positive. CIMS staff is working with the maintenance manager and the administrator to adopt a repair schedule and cleaning schedule. The kitchen has many sanitation and cleanliness issues and concerns. CIMS has contacted the contracted dietary consultant for follow-up in these areas, and CIMS will visit a few times per week to oversee the progress in the kitchen.

### b. Staff

All department manager positions are filled at this time. The nursing department is stable with no agency staff utilized since November 1, 2016. The staffing levels appear appropriate for the census, and adequate to provide quality, patient-centered care. The administrator is a Registered Nurse and is a good resource for the nursing department. She lacks the administrative and financial skills to be an effective successful licensed nursing home administrator. The CIMS team is guiding her and is teaching her to improve in these areas. The marketing director is new to long-term care and the regional marketing director is teaching and training the marketing director the crucial elements of working in the long term-care arena.

### c. Clinical Care

The administrative nursing staff is stable and the director of nursing has been in the position for a few years; she appears to have control of the nursing department. The facility has

some nursing care issues, and the CIMS regional nursing consultant is in the facility weekly. The facility recently underwent a public health complaint survey regarding a self-reported resident fall. The resident sustained a small laceration and received sutures at the local emergency room. The facility is awaiting the formal survey report, but the surveyor did indicate a citation would be issued for care concerns and care plan documentation. The CIMS regional nurse consultant is working closely with the facility to improve care issues and to provide education on care plan documentation.

   *d. Marketing*

  The facility has a new marketing/admissions director who has been in the position for a few months. She has good marketing skills, but little knowledge of the healthcare industry. She is outgoing, and the facility had over 10 new admissions during the last few months in September and October. In November the rate of referrals declined. The CIMS team is in the process of addressing this decline in referrals. They discovered the hospital has sent several notices to the facility concerning nonpayment for the medical director's service to the facility over the last few months. The medical director is an employee of the hospital and he receives payment from the hospital for his services. A member of the CIMS team has contacted the hospital to explain the receivership situation. Payment has been made for the November and December Medical Director Service Fee, and a meeting has been set with the Receiver to meet with the hospital and Medical Director.

  The regional marketing director is working closely with facility staff on ways to increase the census. Rivershores has the only internal dialysis unit in the area; this will be a focus of the marketing plan. The facility will require intense oversight by CIMS to improve quality of care and the marketability of the facility.

e.  *Capital Investments*

i.  Generator Repair

This was completed 12/29/16 at the cost of $1,509.98 by Cummins Central Power LLC.

ii.  Remote Switch

Approximately four months ago, prior to the Receivership, a new boiler was installed. When the local electrician performed this installation, he noted on his service report that the facility did not meet the current requirement for a shut-off switch. This has not been cited yet by IDPH, but most definitely will be when they do their next survey. Currently two bids have been obtained and a third bid will be coming in a few days.

iii.  Freezer

Reach-in style unit or units need to be purchased as the current one has been repaired several times and ultimately will stop working entirely. Bids range from $5,000 to $11,000.

iv.  Water Heater

On 1/12/17, one of the water heaters providing hot water to a wing was malfunctioning. The bottom is rusted out and there is some leakage. Maintenance staff is collecting bids, and expect the proposal to be approximately in the range of $10,000 - $12,000.

f.  *Census Evaluation*

- 11/1 Beginning census        = 76
- 11/30 Ending census   = 72                      (-4)
- 11/30 No residents in hospital at the end of the month
- 11/30- Resident days = 2174
- 12/1 Beginning census        = 72
- 12/31 Ending Census  = 72
- 12/31- 2 residents in hospital anticipated to return
- 12/31-Resident days = 2246              (+72 days more than Nov)

**B**      **Inventory of Receivership Property**

Pursuant to Local Rule 66.1, an inventory of the equipment at each facility is attached hereto as **Exhibit A**.

**C.**      **Preliminary Financial Review**

I.      Treasury and Facility Operations Banking

The primary financial institution for the receivership facilities is M.B. Financial Services. Each facility has three bank accounts that were separated from ManagCare corporate banking and treasury management. To avoid interruption or delay of electronic receipts, CIMS assumed control of the existing bank accounts for the Receivership homes, modifying the account names to include Suzanne Koenig as Receiver and replacing ManagCare signatories with the Receiver and Receivers' CFO as sole signers.

Each entity has three accounts; all facilities have an Operating account, an account designated as Government and a third account, called Depository. The Operating account is used for all disbursements, i.e. vendor payments and payroll obligations. The Government and Depository accounts are pass-through accounts that are used only for electronic receipts and manual deposits. Receipts in the Government and Depository accounts sweep daily to the Operating account. The Government accounts are only used for Electronic Funds Transfer ("EFT") payments from Medicare. The Depository account is used to capture Medicaid and insurance EFTs and other non-electronic deposits. The Receiver was told by the CEO of Mosaic that the intent of this structure was to differentiate funds for line of credit, however, this never materialized with ManagCare. As bank fees are based on number of transactions made to and from accounts and to outside entities the Receivership will review the cost of keeping so many bank accounts in place in the future.

26

The Receiver also took control of "Web Express," the on-line banking system with M.B. Financial. This program has secure access using a combination of passwords and digital tokens which are now unique to the Receivership. M.B. Financial Services required significant paperwork be completed prior to taking control of the ManagCare accounts. Not all the requested controls were in place November 1, 2016. One control was ACH debit eliminations. The centers had multiple expenditures set to automatically pay from the Operating account via an ACH debit. All Non-payroll ACH transactions have been fully eliminated as they would be payments of expenses prior to Receivership. No changes were made to payroll ACH debits as preapproval of payroll dollars are authorized by the Receiver with the payroll service prior to submission to the bank. These changes were in effect the first week of Receivership control.

II.     Pre Receivership

To date, the Receivership has had to fund prior owner expenses and/or has had to reduce its cash by a total of $468,897 due to the following issues.

During the bank changes to eliminate ACH payments, M.B. Financial asked the Receivership to approve any ACH debits that were presented for payment on November 1[st,] before the requested stops could go into effect. One significant ACH was presented for $92,137.47 to American Express. This was the deposit ManagCare paid Kone Elevator for refurbishment of an elevator car at Capitol Healthcare. This was the only American Express ACH the Receiver was made aware of by the bank. As the elevator is a patient and employee safety issue, the Receiver approved the payment to be processed. When the November bank statements were received, there were several more American Express ACH debits totaling $61,939.00. There was also an ACH debt in the Rivershores facility to Chase EPay for $21,223 with a reference of Eli Davis. Total ACH's on 11/1/16, for all facilities combined were $175,297.00. Had the Receiver known of these before the bank paid them, she would have

reviewed them prior to payment to determine if these payments were for items needed on behalf of the residents. Follow up will be made with both ManagCare and M.B. Financial Services for back up documentation for these charges.

As CIMS requested, ManagCare provided October bank reconciliations in mid-November with copies of the October bank statements reconciled to the general ledger of the facilities. These were the reconciliation for the Receiver's starting cash balances. The accounting was up to date however, upon review of the reconciliation, 2 of the 6 accounts had negative balances. Once all outstanding checks cleared, Heights Healthcare and Morton Villa, had negative balances of $32,689 and $25,961 respectively. The Receivership transferred funds, lending between facilities, so all outstanding checks would be paid when presented. A total of $(58,650) of payments was issued prior to the appointment of the Receiver, without cash in the bank to cover these checks.

During a review of provider bed taxes, the Receiver found that ManagCare paid the May and June taxes, but subsequently, voided the checks originally cut to pay the provider bed tax and did not notify the State of the pullback of funds. As result, the Receiver had to incur $133,455 in unpaid taxes for May and June, and penalty and interest of $71,495. The total pre-receivership liability of $204,950 has been paid by the Receiver.

In early December, the Receivership became aware of an unpaid Civil Monetary Penalty in the Capitol Healthcare facility from the CMS for past survey deficiencies totaling $30,000.00. This settlement was negotiated by Mosaic's lawyer pre-receivership, assuming the center would not appeal the findings, but was never paid by Mosaic. This payment was made by the Receiver

on December 19, 2016, to avoid further penalties and interest and possible sanctions against new admissions.[2]

Worker Compensation open cases totaling $930,221, are Pre-Receivership claims, with $608,678, in reserve, and $321,543, already paid, to settle claims. The rest of the claims are scheduled to be paid when settled and will continue to be outstanding from the Pre- Receivership time period. The Receiver is working actively with the prior carrier to settle any cases that are current and former employees of the facilities.

III.    Resident Trust Banking

The facilities use web-based software called Resident Fund Management System ("RFMS") for resident banking, which is software administrated through National Data Care ("NDC"). The system allows the center to maintain individual resident accounts and produces monthly statements for each resident with balances. The system also allocates interest income and manages the personal portion and care portion of applied income. NDC also does applications on the facility's behalf to become representative payee for Social Security. This system is widely used in nursing facilities. All RFMS accounts were under the ManagCare corporate account. The Receivership has separated the facilities from the corporate account so that interest and fees can be appropriately allocated. The individual facility administrators and his/her designee are signers on these accounts and the Receiver was not added to the accounts, but may be in the future, if an administrator resigns. There are no residents with significant balances that could jeopardize their Medicaid eligibility. There are, however, many zero balance accounts that the centers are paying fees that could likely be cancelled. Detailed analyses will be done in subsequent months to clear these accounts and unnecessary fees.

---

[2] Attached as **Exhibit B** are summaries of the survey results for the facilities from January 1, 2016 through January 10, 2017.

IV.    Miscellaneous Bank Accounts

There are a few bank accounts in the name of the facilities at local banks, used only for petty cash. Without a local bank account, facilities in rural areas are unable to cash petty cash checks issued by the corporate office. These accounts have a minimal balances required to keep them open.

V.    Payroll

Paylocity is the payroll service used in all Receivership facilities. Each facility has varying pay weeks, staggered for cash flow requirements. Most employees opt for direct deposit or debit pay card. Others receive manual checks. Paylocity manages the payment of garnishments and miscellaneous deductions including 401K, health, dental and employee as remittance of employee and employer payroll taxes. All Receivership facilities are still under the ManagCare umbrella, however, Paylocity and the Receiver is continuing under the same tax ID numbers for W2s and annual cost report filings. Under the Paylocity administrative set ups, Mosaic has been removed from viewing the six Receivership facilities, but can see they exist. The Receiver can see the other ManagCare facilities on the Paylocity site, but cannot select or review any data associated with them.

The Receivership has not changed payroll processing, but has implemented a stronger stance on administrator review and approval of payroll, prior to submission to the Receivership for payment. Some facilities have been allowing staff to take Paid Time Off (PTO) in excess of their earned time available. This was occurring in nursing and other departments prior to the Receiver appointment as well. Overtime is excessive in the Capitol Healthcare and Morton Terrace facilities, running in excess of 500 hours biweekly, at a cost of ~$15K/week. Morton Villa and Heights Healthcare average more than 300 hours OT per pay period or ~$7K/week. The Receiver and CIMS have implemented Administrator accountability for all payrolls to

determine if the overtime is due to call outs, staffing issues such as not enough staff on certain shifts or just shift overlap. Schedulers have been directed to staff according to census and standard nursing to patient ratios. In upcoming months, CIMS, with the Receiver, will analyze each payroll in detail to determine which facilities need more oversight in controlling unnecessary payroll expenses.

VI.     Accounts Receivable ("AR")

Each facility has one or two individuals designed as Business Office Managers. These individuals process the daily census, make deposits with scanners for checks received by the facility and consult with family members on Medicaid applications. They do not do billing or collections.

Opening accounts receivable for 10/31/2016 was $15,059,460 for all 6 facilities. For the month of November, the Receivership/Platinum billed $3,208M for resident care and the centers received $2.767M in receipts on prior month's services. The result is the 11/30/16 balance of $15,462,060.

Of the total AR, the largest component is due from Medicaid, a total of $6.3M a combination of active and pending Medicaid of the outstanding balance. Of this balance, $2.2 belongs to the Capitol Healthcare The second largest piece of the $15M is $3.4M due from Private Pay, the majority, $1.7M is in Capitol Healthcare The lowest AR is Colonial Healthcare with $1.05M and $491K or virtually half due from Medicaid. The allowance for doubtful accounts will be reviewed with each centers' operating results but overall, it appears there may be more bad debt than reserves to cover. Overall, there is much to be analyzed whether or not it is collectible. There is a detailed aging by payer included with the November financial statements attached hereto.

VII.    Critical Vendors and Prior Period Expense

For critical and large services, there are several vendors common to each facility. The Receiver has not modified or renegotiated any of the services or pricing except for food and medical supplies at this time. The Receiver plans to negotiate new pricing with vendors whose contracts are higher than industry standard prices. Many critical vendors have large balances of accounts payable owed to them prior to the appointment of the Receiver, however, they are still working with the Receivership facilities in providing them goods and services.

Environmental Services - Healthcare Services Group, Inc. often referred to by the acronym for their name, HSG, provides housekeeping and laundry staff services and cleaning chemicals and supplies. They often rent laundry machines and floor care equipment. They are owed monies from prior to the Receivership period and continue to service the facilities; however, many of the kitchens in the facilities are dirty and have many sanitary issues. CIMS has aggressively addressed the cleanliness in many of the facilities and will continue to hold them accountable for their services provided to the facilities.

Therapy Provider- Rehab Care provides occupational, physical and speech therapy to the residents in the facilities. Rehab care is presently operating under a Corporate Integrity Agreement for past practices throughout the country. As a result, many of the claims are held for audit by CMS, which poses a higher risk than other Rehab companies, to the Receivership facilities. ManagCare therapy bills currently under active audit/ appeal stage exceed 300 active claims, totaling $933,282. More than half of these claims belong to Capitol Healthcare.

Pharmacy- Omnicare Pharmacy has sent certified letters to each facility demanding a Pay In Advance ("PIA") requirement for the Receivership. Based on a review of the proposed PIA monthly payment for The Heights and for Rivershores, the proposed amounts are ~25% higher

than the spend rate for the past two months. For example, the Heights average per month pharmacy expense has been $11,858 and the proposed PIA fee is $16,791. It appears that the vendor is trying to recover old balances by inflating current ones. The Receiver has made telephone attempts to reach the attorney who sent the letters on behalf of Omni, but calls have not been returned. Negotiations are planned to continue.

Food – Prior to the receivership, the incumbent food vendor, Performance Food Service ("PFG") Springfield, provided the majority of food to the facilities with the exception, being Prairie Farms Dairy and Alpha Baking. PFG was unwilling to accept the receiver order and vendor letters and demanded payment on delivery, or advanced payments, of $40K/week for all facilities combined. The Receiver, in conjunction with Food and Supply Source negotiated new payment arrangements and pricing with Sysco Food Service. They too wanted payment in advance; however, the amounts were lowered to $25-30K/week. The Receiver, in conjunction with Food and Supply Source and Sysco, made new menus with improved quality meal items at a budgeted lowered amount than the previous Food Service Supplier. The transition was smooth and occurred within 30 days for all 6 facilities.

Medical Supplies – Medical supplies were supplied from Twin Med, LLC for four of the facilities prior to the appointment of the Receiver, and McKesson Medical-Surgical Extended Care, supplied two of the facilities for medical supply needs, prior to the appointment of the Receiver. Both companies did not want to continue providing goods and services under the Receivership, however, Twin Med, LLC., stopped supplying medical supplies to the residents of the facilities without notice, in the first few days of the Receivership and McKesson honored their agreement to supply goods until another supplier was retained.

Medline Industries, Inc. is the new supplier of medical supplies for all six facilities. The Receiver negotiated more favorable prices, as their prices are lower than both the previous suppliers and their payment terms are 120 day terms, which are more favorable than the previous other suppliers. Medline's customer service was far superior, as there were no delays and all facilities received supplies in a very smooth transition to Medline Industries.

The Electronic Medical Record that all the facilities are using is through HealthMedx, and a new contract is in process, to be signed by the Receiver, as well as, the support to be provided by Provinet Solutions, to Vision, the software utilized.

Contract Billing Services & Accounts Receivable - As of April, 2016 ManagCare outsourced billing and collections of resident Accounts Receivable (AR) to Platinum Billing Solutions of Lakewood, NJ. Upon consultation with Platinum management, they are only focused on collecting AR from the start of their contract forward. Platinum uses billing software called Vision that the Receivership accountants do not yet have access to. The Receivership is reliant on Platinum producing reports. Due to the large open payables balance Platinum had with the ManagCare group, Platinum is insistent on being paid at the beginning of the month. Their invoices for November and December have been paid to date. The Receiver plans to further analyze the voluminous number of resident balances on the open aging reports. With total AR balances is in excess of $15M and more than $9M is over 90 days old. The Receiver will evaluate whether Platinum has enough resources to collect these funds and whether the services that Platinum provides justify their fees.

Several other facility contracts continue to be reviewed and will be dismantled from the corporate relationship at Mosaic, as that is how most of the vendor relationships were negotiated,

prior to the appointment of the Receiver. Vendor contracts will be properly attributed to the facilities under the Receivership estate. There will be ongoing updates on these matters.

VIII.    Summary of Financial Operation Results

Pursuant to this Court's December 23, 2016 order, the following are attached hereto: Cash Disbursements by Facility by Month (**Exhibit C**); November Financial Statements (**Exhibit D**); Pre-receivership Debits (**Exhibit E**); Civil Monetary Settlement (**Exhibit F**).

The financial statements, balance sheet and income statement for the month of November with year to date results add the Receivership period of management to ManagCare. Due to the delays from the Defendants sharing access codes and information until December, the balance sheet accounts are not fully analyzed but will be for the year end close in December. The enclosed accounts receivable aging reports showing Medicaid pending dollars are the funds the facility is not getting for care provided, current and cumulative. These are important to note for cash flow in meeting Receivership payment obligations for labor, products and services. The buildings under Receivership have stopped admitting Medicaid pending residents without a payer source.

Overall November month profit and loss is summarized by facility below. All but two of the centers had a positive gain from operations. These expenses exclude management fees and rent.

| November MTD | Net Revenue | Expenses | Net Income |
|---|---|---|---|
| Capital | 703,896 | 757,015 | (53,119) |
| Colonial | 377,787 | 283,636 | 94,151 |
| Heights | 415,268 | 403,102 | 12,166 |
| Morton Terrace | 420,002 | 419,189 | 813 |
| Morton Villa | 386,471 | 360,883 | 25,588 |
| Rivershores | 354,848 | 403,159 | (48,311) |
| **Total** | **2,658,272** | **2,626,984** | **31,288** |

<u>Census and Occupancy</u>: For the month ended November 30, 2016, the facilities had an overall occupancy of 67.2%, with the largest payer type being Medicaid. 3,174 patient days or ~106 patients combined are without a payer source and are categorized as Medicaid pending until their applications for public assistance is approved by the State. To note, prior to the Receivership, there had been a discrepancy in the total number of licensed beds each facility had. Platinum billing had incorrect occupancy in *every* building. The errors have now been resolved. Of particular concern is the low census in Capitol at 62.6% and Morton Terrace at 56.9%. The average daily census throughout the portfolio for insurance/managed care payers is less than 3 residents, except for Rivershores who has 3. Without high enough Medicare survey star ratings, the facilities will be challenged to secure additional managed care contracts. For quality payer mix, they must rely on private pay and Medicare payers.

<u>Expenses</u>: The Receivership has not changed any of the preexisting vendors with the exception of food services and medical supplies. Payroll, the largest expense, previously discussed is also being reviewed for excessive overtime and PTO taken in advance of earning it which occurred prior to the Receivership. In addition, staffing levels in line with census are also being reviewed. Capital expenses and deposits for capital projects have been capitalized and have not been expensed. The Receiver is still finding out about centralized services and leases that the centers do not have the invoices for such as copiers, nursing equipment and technology. In months to follow, the expenses will be further analyzed to explain profit and loss results in detail.

**D.     Preliminary Litigation Review**

Under Section 4(n) of the Receivership Order, the Receiver must "institute, prosecute, defend, and/or settle such legal proceedings as Receiver deems necessary relating to the care or possession of the Property ...." Additionally, under Section 16 of the Receiver Order requires that

the Receiver include with this Report a "current inventory of the funds, assets, and property remaining in the receivership, interest in and *claims against* same." Pursuant to these obligations, Receiver is aware of the following legal proceedings/ outstanding insurance claims against the various Receivership Entities:

    I.    *Pharmacy Corporation of America, et al. v. Mayfield Care Center, Inc., et al.*, Case No. 16-cv-10279, Northern District of Illinois, Eastern Division.

On November 2, 2015, the Receiver became aware of a pending lawsuit in which two of the Receivership Entities, Capitol Healthcare and Rivershores were named as defendants in a collection action. That action is pending in the United States District Court for the Northern District of Illinois, Eastern Division and is captioned *Pharmacy Corporation of America, et al. v. Mayfield Care Center, Inc., et al.*, Case No. 16-cv-10279. On November 28, the Receiver filed a Motion to Stay the aforementioned litigation. On December 5, 2015, Judge Chang granted the Receiver's motion, citing the need to preserve Receivership assets.

    II.   *Alton Davis v. Capitol Healthcare and Rehabilitation Centre, LLC et al.*, Case No. 2016 L 00274, Circuit Court for the Seventh Judicial Circuit, Sangamon County, Illinois

On November 22, 2016, Ms. Koenig became aware of another pending lawsuit in which Capitol Healthcare was named as a defendant in a negligence action. That action is pending in the Circuit Court for the Seventh Judicial Circuit for Sangamon County, Illinois and is captioned *Alton Davis v. Capitol Healthcare and Rehabilitation Centre, LLC et al.*, Case No. 2016 L 00274. The matter has been tendered to the relevant insurer.

    III. Outstanding Malpractice Claims

On December 5, 2015, after this Court held a hearing on the Receiver's motion to stay litigation, counsel for the Defendants informed counsel for the Receiver for the first time that there are a number of outstanding malpractice claims against the facilities pending. Counsel for

Defendants sent only a list of these matters. Receiver's counsel requested that Defendants provide the complaint and insurance coverage letters for each of these claims to allow the Receiver to assess the potential risk. On December 8, 2016, counsel for Defendants refused to do so and instead directed Receiver's counsel to get the materials from the insurer. More than one month passed before Receiver's counsel obtained even basis information about these claim file. On January 13, 2017, AIG provided Receiver's counsel with: (1) a list of all outstanding claims (which included claims that Defendants' counsel did not include in the previous list), (2) complaints for all outstanding claims; and (3) insurance coverage letters. A list of the outstanding claims is attached hereto as **Exhibit G**.

**E.      Insurance Status**

I.      Overview

The Receiver has engaged a broker to assist in assessing insurance coverage for the facilities and to assist in obtaining policy coverage for the 2017 year, as policies expired at the close of 2016. The Receiver is putting together a complete insurance program that not only takes into account premium expense, but also coverage of the assets and efficiencies that will in the long run, be in the best interest of the insured and the landlord.

II.      Status of Coverage

Here is an update of what was encountered upon entering the facilities on November 1, 2016, what has been done since, and what the Receiver planning to do in the coming months. Receiver engaged a trusted insurance broker to assist with this process, replacing Worthy Insurance Group, which – on information and belief – is affiliated with the prior operators.

- Property Insurance: The previous operator had a property policy in place from December 28, 2015 – December 28, 2016. The Receiver was informed that the landlord, in a clear effort to protect their assets, purchased on their own property

insurance for their 6 buildings. The Receiver uncovered that there were two policies in effect on the same property. The previous operator's policy is in cancellation status.

- Auto, Crime and EPLI (Employment Practices Liability Insurance): These three separate coverages are currently written on a master policy with four other Managcare facilities. Although the Receiver felt from an operational perspective removing the 6 facilities from the master is in Facilities 's best business interest, in this specific scenario it made sense to continue with the current policies for these lines of coverage. All 3 of these lines of coverage were placed within a week prior to Receiver's appointment and the Receiver was comfortable with the adequacy of coverage in place and that all interested parties were protected. In order to defray cost, the Receiver financed the 6 facilities portion of the premium whereby, assisting in the operator's cash flow.

- Workers' compensation and professional liability insurance: These lines of insurance were set to renew on 12/15/2016 and 12/28/2016 respectively, for an annual term. The Receiver has appointed Assurance Agency as broker of record and has negotiated terms for the renewal.

- Employee Medical Insurance: The Receiver received a cancellation/termination notice from Tandem HR, an entity that apparently provides the employee healthcare benefit plan to the receivership facilities and additional Managcare/Mosaic facilities. The Receiver was able to negotiate a resolution and the plan was not terminated.

**F.    Computer and Wi-Fi Access**

After entry of the receiver order on November 1, 2016, the Receiver encountered substantial difficulty in accessing and transitioning the key computer and electronic systems at the facilities. Shortly after November 1, 2016, and as authorized by the receiver order, the Receiver engaged the services of Mark Singer with Compu-Solutions Inc. to assist with IT support for the Receivership Entities. To provide this support, Mr. Singer needed the following information, *inter alia*: (1) local administrative passwords for all computers at all facilities or a temporary domain admin account to allow the Receiver to move to the new Active Directory; (2) password information for administrator for all current email accounts for all facilities and current invoice for email provider; (3) passwords for all local firewalls; (4) passwords for time clocks; and (5) Passwords for internet providers to gain access to their accounts and migrate billing to CIMS. This information was needed in order for the Receiver and her team to access both clinical and financial data for the facilities and to migrate necessary data off of the shared platform utilized by Defendants for these entities and other entities that are not part of this receivership.

Section 13(g) of the receiver order required the Defendants and/or their agents to "provide or make available to the Receiver . . . any and all records and information concerning the Property and operation of the skilled nursing home facilities thereon, including, without limitation, all written and electronic books, records, correspondence and other information" within two days of entry of the Order. Pursuant to the receiver order, the Receiver requested this information, among other things, from the Defendants numerous times in November and was eventually told that the Defendants did not have possession of the information. The Receiver was referred to Creative Technology Solutions ("Creative"), the vendor previously engaged by the Defendants to provide IT support. As detailed in the Emergency Motion to Compel [Dkt. No.

29], on or around November 23, 2016, Creative refused to provide this information to the Receiver without payment of all pre-receivership invoices. This refusal to provide the requested information led to the filing of the motion to compel and this Court's Order granting that motion on November 28, 2016 and a direction that the parties were to work together to facilitate a smooth IT transition.

Thereafter on December 1, 2016, the Receiver received some but not all of the required information. It was not until on or about December 5, 2016 that the Receiver had possession of all of the necessary passwords and authorizations. Additionally, Defendants and their agents delivered an electronic storage device containing archived information for the Facilities on or about the same date. After their receipt, the Receiver's team worked diligently to transition the facilities to their own platform and to access, download and review necessary financial data. This process took nearly two full weeks and could have been accomplished with far less difficulty had there been a cooperative transition.

Subsequently, on or about December 14, 2016, the Receiver was forced to deal with an urgent situation relating to wireless at the Capitol Healthcare and Heights Healthcare facilities. These facilities use Meraki wireless, which is a subscription based cloud managed wireless product. If the devices are not registered to a cloud portal, they will become inactive. On December 14th, Creative removed the Wi-Fi access points from his Meraki Web Portal. This immediately turned off the Wi-Fi at the two facilities mentioned and cause severe problems with delivery of medications and patient standard of life. Marc Singer and his team solved this problem with expedited efforts and learned the following:

- The original access points were purchased on EBay, which means they had no support and theoretically are not properly owned or licensed to the facilities.

- This is in violation of the Meraki rules and contracts.

- Because Creative removed the devices from there portal and did not provide serial numbers, the Receiver had no way to gain access to the devices.

- CDW Rep and Meraki rep attempted to correlate one serial number to find purchase order for remaining devices to get their serial numbers, but since they were purchased on eBay, they we all from random locations, still licensed owned by the original owners.

- After numerous (4+) hours attempting to get help from Meraki tech support, Marc Singer found a tech named Rohit who was able to instruct Marc, who then instructed Creative how to get a log of the items that had been removed.

- Once the serial numbers were retrieved, 2+ more hours were spent associating the devices to a new Portal created for CSI/CIMS.

- Numerous devices were found to be improperly setup for the wrong country (Canada vs US) meaning they were violating FCC regulations for transmission power. These devices had to be reprogrammed.

- Finally, 24 hours later Wi-Fi had been restored to both facilities.

- Licensing still needs to be purchased.

- The devices cannot be truly "Transferred" to ownership of CIMS (Capitol/Heights) without contacting the original owners of each device and having them relinquish the devices in writing to Meraki support.

Date: January 17, 2017                                          Respectfully submitted,

                                                               /s/ *Suzanne A. Koenig*
                                                               Suzanne A. Koenig

                                                               *Court Appointed Receiver*

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan Claydon, certify that on January 17, 2017, a true and correct copy of the foregoing was served electronically through the Northern District of Illinois CM/ECF electronic filing on all counsel of record.


<u>/s/ *Jonathan Claydon*</u>
Jonathan Claydon